Mary McNamara, SBN 147131
mary@smllp.law
Britt Evangelist, SBN 260457
britt@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010


Attorneys for AJAHNI SOTELO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>AJAHNI SOTELO<br><br><br>　　　　　　　Defendants. | Case No.  CR 18-00165 WHO<br><br>**DEFENDANT AJAHNI SOTELO'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE UNDER 18 U.S.C. § 3553(A)**<br><br>Sentencing Hearing: April 2, 2020<br>Time: 1:00pa.m.<br>Court: Hon. William H. Orrick |

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. THE PRESENTENCE REPORT ................................................................................... 1

III. SENTENCING RECOMMENDATION: A TIME-SERVED SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE GOALS OF SENTENCING ........................................................................... 3

    A. The need for the sentence to reflect the nature of the offense and the history and characteristics of the defendant ...................................................... 3

        i. *The nature of the offense* ........................................................................ 3

        ii. *The history and characteristics of the defendant* ................................. 4

    B. The need for the sentence to achieve the goals of sentencing (reflect the seriousness of the offense and provide just punishment; afford adequate specific deterrence and general deterrence; provide the defendant with proper rehabilitative care) ................................................................................. 8

        i. *The Statutory Goals of Sentencing Have Been Achieved by the 7 Months Mr. Sotelo has Served in Custody* ............................................ 8

        ii. *Incarceration in Either the BOP or Santa Rita Jail Will Expose Mr. Sotelo to a Greater Risk of COVID-19 Infection – A Punishment Much Greater Than Necessary Given his Offense* ......... 10

IV. CONCLUSION ............................................................................................................ 14

# TABLE OF AUTHORITIES

### DOCKETED CASES

*Babu et al v. Ahern et al*, 18-cv-07677 NC (N.D. Cal.) ............................................................... 11

*Gonzalez et al v. Ahern et al*, 19-cv-07423 JSC, (N.D. Cal.) ...................................................... 11

*In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) .................................................. 14

*In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230
   (N.J. Mar. 22, 2020) ................................................................................................................ 14

*Mohrbacher et al v. Alameda County Sheriff's Office et al*, 18-cv-00050 JD, (N.D. Cal.) ....... 11

*Steel et al. v. Alameda County Sheriff's Office, et al.*, 18-cv-05072 JD (N.D. Cal.) ................. 11

*United States v Garlock*, No. 18-cr-00418, 2020 WL 1439980 (N.D. Cal. Mar. 25, 2020) ............... 9, 14

*United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) ........................................ 14

*United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) ................. 14

*United States v. Copeland*, No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) ............................... 14

*United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ............................................... 14

*United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) .................................................. 14

*United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227 (D. Idaho Mar. 16, 2020) .... 14

*United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225 (S.D.N.Y. Mar. 19, 2020) .............. 14

*United States v. Selna*, 8:16-cr-76-JVS (C.D. Cal. Mar. 26, 2020) ........................................... 14

*United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) ................... 14

*Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) ............................................. 13

### STATUTES

18 U.S.C. § 3583(e)(2) ................................................................................................................... 3

**Defendant's Sentencing Memo.**
*United States v. Sotelo*
CR 18-00165 WHO

**Defendant's Sentencing Memo.**
*United States v. Sotelo*
CR 18-00165 WHO

-iii-

## I. INTRODUCTION

Ajahni Sotelo has pled guilty to a hand-to-hand methamphetamine sale. He was just 19 years of age at the time and was involved in the offense conduct by an older man who was a federal target. Mr. Sotelo has no other criminal history – either juvenile or adult. He has shown no propensity towards violence or other dangerous behavior and the drug sale was motivated by his long-standing drug addiction. Were it not for the presence of his co-defendant, who had previously been prosecuted by the U.S. Attorney's Office for similar offenses, Mr. Sotelo would never have been charged federally and likely would have received a no-time diversion disposition from the San Francisco District Attorney's Office. Instead, as a result of drug use on pretrial supervision, Mr. Sotelo has now served approximately 7 months in pretrial confinement at Santa Rita jail – a harsh punishment under any circumstance. But now, with the COVID-19 pandemic inside the jail, he faces a very real threat to his health, and even his life, if his incarceration continues. Mr. Sotelo's family continues to be very supportive of him and his maternal grandmother wishes him to reside with her after his release. In short, if released, he has a place to call home, to isolate himself and to reduce his chances of becoming a disease vector.

The Probation Office has recommended a sentence of a year and a day and the government makes no recommendation. The defense submits that imposition of anything other than a credit-for-time-served sentence would be greater than necessary for Mr. Sotelo's low-level crime in ordinary times, but in this time of emergency, it would impose a far greater and, and potentially, deadly punishment. Defense counsel therefore requests Mr. Sotelo's immediate release at sentencing on April 2, 2020.

## II. THE PRESENTENCE REPORT

Mr. Sotelo's total offense level is 21, he has no criminal history and his advisory guidelines range is therefore 37 to 46 months.[1]

The defense recognizes that the Probation Office has recommended a sentence substantially below the advisory guidelines range – 12 months and one day - and agrees with the Probation Office that

---

[1] Mr. Sotelo has no objection to the factual recitations in the Probation Officer's Presentence Report ("PSR") and agrees with the Probation Officer's mathematical calculation of the applicable sentencing guidelines.

1

Mr. Sotelo's youth, lack of criminal history, the trauma he experienced in adolescence, as well as his untreated mental health diagnosis and history of substance abuse all justify a downward variance from the guidelines range.  *See* PSR, ¶ 94; *id.* at Sentencing Recommendation ("Sentencing Rec."), pg. 2-3.  However, the Probation Office's sentencing recommendation does not fully account for the low-level reality of Mr. Sotelo's conduct and the fact of his having been involved in the offense by his older co-defendant, a high-value federal target.  Nor does it account for COVID-19 pandemic or explain why the statutory goals of sentencing are not fully served by a time-served sentence of 7 months.  The defense submits that holding Mr. Sotelo in custody for an additional 90 days undermines sentencing purposes given the increased risk of contracting the virus, receiving inadequate medical attention if becomes ill, and spreading the virus to his fellow inmates, prison staff and their families in the greater community.

Mr. Sotelo also objects to the Probation Office's recommendation that he receive a three-year term of supervised release and instead requests that the Court impose a one-year term.  Mr. Sotelo has been on pre-trial release for nearly two years, including the 7 months he has been incarcerated following remand.  *See* Dkt. 4 (4/23/2018 order setting initial conditions of release).  The guidelines call for a "[a]t least one year but not more than three years for a defendant convicted" of Mr. Sotelo's offense.  U.S.S.G. § 5D1.2(a)(2).  The defense submits that a term of supervised release at the lower end of the guidelines range is appropriate here.  Although Mr. Sotelo has had repeated failures on pretrial release, and has frustrated the Court's and the parties' efforts to treat his drug addiction, he has still served a lengthy period of time under supervision, interspersed with confinement in drug treatment centers and now, in jail under harsh conditions.  Supervised release serves a different function, however.  The "primary purpose of supervised release is to facilitate the integration of offenders back into the community rather than to punish them."[2]  While a lengthy term of supervised release may be necessary for offenders emerging from a long prison term and who therefore require additional assistance integrating back into society Mr. Sotelo is not in that category of offender.  Because of the support provided by his family (see discussion below), he will not need the same level of services as other

---

[2] United States Sentencing Commission, Federal Offenders Sentenced to Supervised Release, at 9, available at https://www.ussc.gov/sites/default/files/pdf/training/annual-national-training-seminar/2012/2_Federal_Offenders_Sentenced_to_Supervised_Release.pdf

**Defendant's Sentencing Memo.**
*United States v. Sotelo*
CR 18-00165 WHO

-2-

released offenders. And, should the Court later decide that Mr. Sotelo requires a lengthier term of supervision, it has the statutory authority to extend his term. *See* 18 U.S.C. § 3583(e)(2) (court has authority to "extend a term of supervised release if less than the maximum authorized term was previously imposed"); *id*. at (h) (following revocation of supervised release, "the court may include a requirement that the defendant be placed on a term of supervised release after imprisonment" for a period of time not to "exceed the term of supervised release authorized by statute for the offense").

### III. SENTENCING RECOMMENDATION: A TIME-SERVED SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE GOALS OF SENTENCING

#### A. The need for the sentence to reflect the nature of the offense and the history and characteristics of the defendant

##### i. The nature of the offense

Mr. Sotelo recognizes that his conduct has helped to perpetuate the cycle of neglect, poverty and crime that has brought him before the Court – the same cycle he fell victim to – and he is deeply ashamed about that fact. In mitigation, he was 19 years old at the time of the offense, deeply addicted to drugs himself and in the presence of an older man with a criminal history, whom the court has already sentenced to a below-guidelines sentence. PSR ¶ 5. As summarized in paragraphs 13 through 18 of the PSR, following their arrest in January 2018, both were released from state custody. The co-defendant immediately re-offended and was again arrested by officers in February 2018, when he was found to be in possession of drugs, drug-sale paraphernalia, and ammunition (despite the fact his prior convictions prohibited him from possession firearms or ammunition). Mr. Sotelo did not reoffend. The co-defendant also attempted to evade arrest (PSR, ¶15), while Mr. Sotelo did not. The requested sentence of 7 months is not a statistical outlier. An examination of the Sentencing Commission data reveals that 25% of offenders in the Ninth Circuit and nationwide received a sentence of 14 months or less. **Exhibit B** to the Declaration of Britt Evangelist (summary of sentencing data).

**Defendant's Sentencing Memo.**
*United States v. Sotelo*
CR 18-00165 WHO

ii. *The history and characteristics of the defendant*

Mr. Sotelo had a troubled childhood, during which he witnessed domestic violence, experienced neglect and abandonment by his father, and was exposed to drug abuse. PSR, ¶¶ 46-48. However, he also showed promise and an ability to overcome those obstacles and succeed, despite his failures on pretrial supervision. And, unlike many defendants who come before the Court, Mr. Sotelo has a remarkable and supportive family, ever ready to house him, transport him, care for him.

Born in San Francisco, his mother, Oriana Ides, primarily raised him. Although she was a single, teenaged mother, Ms. Ides supported Mr. Sotelo financially and tried to expose him to positive influences as she pursued her own education. Declaration of Britt Evangelist in Support of Defendant's Sentencing Memorandum ("Evangelist Decl."), **Ex. A**, Letters of Support, at 2 (Oriana Ides letter: "On the one hand, Ajahni is a true San Francisco native; he's grown up amidst a strong circle of activists, artists, educators and cultural ambassadors. Despite the obvious challenges associated with being a single, teenage mother, I have always been extremely intentional about the kind of young man I wanted him to be and the positive experiences I wanted him to have.") But Mr. Sotelo idolized his father and yearned to be closer to him throughout his childhood. PSR, ¶ 47. Although Mr. Sotelo's father has developed into a supportive family member today, for much of Mr. Sotelo's childhood, Ms. Ides considered his father a bad influence and fought to keep Mr. Sotelo away from him. As Mr. Sotelo entered adolescence, Ms. Ides began to lose this battle. *Id*.; Evangelist Decl., **Ex. A** at 2 ("Throughout his life, I have fought my hardest to protect him from the same destructive and criminal elements his father waded within but as his teenage years ensued that became increasingly difficult.") Mr. Sotelo frequently ran away from his mother's house to spend time with his father, and, at the age of 15, Mr. Sotelo went to live with his father. PSR, ¶ 47. Things went downhill from there. He distanced himself from his other family members, his grades suffered, and it appeared as though he would not graduate from high school. Evangelist Decl., **Ex. A** at 3(Ms. Ides describing how after Mr. Sotelo went to live with his father, "[h]is performance in school drastically deteriorated and he developed a major truancy issue that cost him dearly; he lost his chance to play basketball, he distanced himself from his family members, and he nearly didn't graduate from high school.") And while Mr. Sotelo had longed to be

**Defendant's Sentencing Memo.**
*United States v. Sotelo*
CR 18-00165 WHO

-4-

closer to his father, the reality of living with him fell far short of his expectations: his father was still often not present to care for him, and even when Mr. Sotelo's father was around, he would often be high and verbally abusive, calling him "retarded" and "slow."  PSR, ¶ 47.

Fearing her son would not graduate from high school, Ms. Ides insisted that he return to live with her.  Despite the long odds at that point, Mr. Sotelo graduated high school, participated in internships and volunteer programs, enrolled in community college, and impressed teachers and other professionals he encountered.  *See* PSR, ¶ 49 ("Although it appears the defendant has had a difficult upbringing due to using controlled substances, lack of parental support, witnessing violence, and doing as he pleased, the defendant managed to graduate high school and engaged in a lot of volunteer work while in high school and after graduation."); *see also* Evangelist Decl., **Ex. A** at 7 (letter from Noor Joons, a former teacher and college advisor to Mr. Sotelo, explaining how she "witnessed how children and peers gravitate towards Ajahni" and how he "has reflected to me personally his love for mentoring youth and working in nature and a desire to do more of this work"); *id* at 12 (letter from Giulio Sorro, a social worker from Mr. Sotelo's high school, describing Mr. Sotelo as having "a genuine compassionate nature" and an "ability to connect with and nurture younger children" and recounting the author's observations of Mr. Sotelo at work in a local after-school program); *Id*. at 9 (Julieta Kusnir, instructor at City College of San Francisco and program coordinator for the Metro College Success program, stating that "through my conversations with him I could see he was genuinely interested in the subject matter and has the potential to excel academically" and describing him as "very bright and good natured.").  Before his arrest in this case, Mr. Sotelo worked for Peace Parks, a community outreach program that provides services to at-risk youth.  The coordinator of that program has indicated Mr. Sotelo will be eligible for rehire after his release from custody.  PSR, ¶ 49 and ¶ 67; Evangelist Decl., **Ex. A** at 8 (letter from Ray Kelly, Peace Parks Coordinator, describing Mr. Sotelo as a "valuable member of the Peace Parks Staff" and adding that "[w]e believe in Ajahni and we want him to be a part of the Peace Parks Family, so he can share his life experiences and not only help himself but help others that are faced with similar situations in their life").

**Defendant's Sentencing Memo.**
*United States v. Sotelo*
CR 18-00165 WHO

-5-

Although Mr. Sotelo graduated from high school, enrolled in community college, and was working before his arrest, he had also developed serious substance abuse problems. He started using marijuana at the age of eight, and by middle school he used daily and drank frequently. PSR, ¶ 56. At age 14, he began using cocaine daily, and at age 16 he began using heroin. *Id*. Eventually he began dealing drugs to pay for his addictions (*id*. at ¶ 58), which resulted in his arrest in this case. By that time, his heroin use had resulted in a full-blown addiction that required prescription medication (Suboxone) to ween him off and reduce the withdrawal symptoms. *Id*. at ¶¶ 52, 58. His performance on pretrial release reflected the severity of his addiction. Pretrial Services gave him multiple chances at treatment, and while he maintained sobriety for periods of time, e.g. for over 3 months while residing at New Bridge Foundation, he would inevitably use drugs or break other program rules, resulting in his termination from the program followed by use. *Id*. at ¶ 61.

Most recently, in November 2019, Mr. Sotelo left the halfway house where he resided and went on a bender. With no objection from the defense, the court remanded him to custody a few days later and he has remained there in the months since. This latest stint in custody has been the longest of Mr. Sotelo's young life. Mr. Sotelo was only 19 years old and he had no criminal history – adult or juvenile – before his arrest in this case. The time in Santa Rita has had a profound affect on Mr. Sotelo. As he explains in his letter to the Court, his time in jail has allowed him to get sober, reflect on his past mistakes, and think about his future. He wants to re-enroll in school, return to work, and stop the cycle of drug use and incarceration that has marred the last years of his life:

> After the arrest, I had chances to get sober. I was able to do good for a while, but my addiction brought me back. I know I have hurt my parents and grandparents. I never wanted to hurt them. I am so sorry. I know I let the people in pretrial and CAP down. I don't want to spend my life letting people down. I want to do better. I have been in jail for months. I've gotten sober and I want to stay sober. I want to get out and take classes at City College like about film making. I want to work with the kids at the Peace Parks again. I love coaching them and helping them. I feel like I am doing something good there. I hope working and going to school will help me stay sober.

PSR, ¶ 23.

People closest to him have noticed the change. *See* Evangelist Decl., **Ex. A** at 5 (Shepali Ides letter, stating "I know that this criminal prosecution has shaken him to the core"); *id*. at 3 (Oriana Ides

explaining that Mr. Sotelo "has been in jail now for many months and I believe that experience has had a profound effect on him. He has now seen what failing on this journey will look like – separation from his family and friends for months or even years at a time."). They believe that if released from custody he can overcome his addiction and begin to live up to the promise he showed earlier. His maternal grandmother, Shephali Ides, in her letter to the Court reflects on the promise Mr. Sotelo has shown throughout his life, including during periods of sobriety in this case, and describes him as a "young man who has great potential." *Id*. at 5. His mother likewise "believe[s] deeply in his ability to contribute positively to society because that is his desire at his core and I have seen his ability to do just that. He absolutely comes alive when he is in service to others." *Id*. at 3. And his uncle, Robert Sotelo, writes of Mr. Sotelo's prior work with the Peace Parks program, describing how he was "well liked by many young kids in the program I believe because of his caring nature" and stating that "I know [Mr. Sotelo] can do good work, because I've seen him do it." *Id*. at 14.

All of Mr. Sotelo's family members attest to their continued willingness to support Mr. Sotelo. *Id*. at 5 ("His family loves him and will do whatever possible to support him. We deeply want to see him thrive rather than self-destruct."); *id*. at 3 ("And please know that when Ajahni is released from jail, his family will be there to support him every step of the way."); *id*. at 14 ("I think it is important for you to know that we all live close to each other and we will be nearby and here for Ajahni when he gets out of jail. Ajahni's being away and in such trouble at his young age has hurt all his family members, but we love and forgive him and will be here to support him."). Since the beginning of this case, multiple family members have attended each and every court appearance with Mr. Sotelo, they have found and enrolled him in treatment programs, and have provided transportation to and from appointments and counseling sessions. Hi maternal grandmother, Shephali Ides, has told undersigned counsel that if released from jail now, Mr. Sotelo can reside with her in Oakland. The Probation Office has also interviewed Ms. Ides and verified her willingness to take in Mr. Sotelo.[3]

---

[3] Shephali Ides would also benefit from Mr. Sotelo's presence in her home. Ms. Ides is elderly and sheltering in place alone during the pandemic. Her daughter (Oriana Ides) lives nearby but is caring for a newborn baby. Shephali Ides and the rest of Mr. Sotelo's family would be grateful to have Mr. Sotelo reside with her during the COVID-19 pandemic so that he can assist with daily living activities, such as

**Defendant's Sentencing Memo.**
*United States v. Sotelo*
CR 18-00165 WHO

-7-

In sum, Mr. Sotelo has shown ability and promise in his short life. He has no prior criminal history whatsoever and has not shown any propensity towards violence or other dangerous behavior. Addiction motivated his crime and the best place for him to overcome that addiction is out of custody where he will not only have access to a greater array of treatment and services, but where he will also benefit from the support of his family.

**B.     The need for the sentence to achieve the goals of sentencing (reflect the seriousness of the offense and provide just punishment; afford adequate specific deterrence and general deterrence; provide the defendant with proper rehabilitative care)**

*i.     The Statutory Goals of Sentencing Have Been Achieved by the 7 Months Mr. Sotelo has Served in Custody*

The statutory goals of sentencing have been achieved by the many months Mr. Sotelo has already served in the harsh conditions at Santa Rita jail. Further, given COVID-19 and its presence in the Santa Rita jail and the Bureau of Prisons ("BOP") system, a sentence of time served is "sufficient" punishment.

Law enforcement officials across the state have begun to release non-violent offenders and/or reduce or eliminate arrests for non-violent felonies and misdemeanor offenses, in an effort to both slow the virus's spread within the jail population and to afford offenders the best chance to avoid contracting the virus. For example, last week Alameda County released over 300 low-level state offenders from Santa Rita County jail and Sheriff Gregory Ahern directed police departments to issue citations for misdemeanors and to bring only serious offenders to Santa Rita for booking.[4] Likewise, just days ago, the Los Angeles County Sheriff's Office announced that it released 1,700 inmates serving short sentences for non-violent crimes and the Los Angeles County District Attorney instructed her prosecutors to "consider ways to keep nonviolent felony and misdemeanor offenders out of our jails and

---

grocery shopping, that are not safe for her.

[4] See "Sheriff Releases 314 Inmates to Reduce Coronavirus Risk at Alameda County Jail." Available at: https://www.nbcbayarea.com/news/coronavirus/sheriff-releases-314-inmates-to-reduce-coronavirus-risk-at-alameda-county-jail/2258026/

**Defendant's Sentencing Memo.**
*United States v. Sotelo*
CR 18-00165 WHO

-8-

courthouses during this pandemic."[5]  And on Friday, Leann Bertsch, the Director of the North Dakota Department of Corrections and Rehabilitation, published an article with Brie Williams, a professor of medicine in the University of California San Francisco, in which Ms. Bertsch explained the North Dakota correctional system will be moving to "reduce the population density inside jails and prisons by evaluating individuals for suitability for accelerated release" by giving prior to "high medical risk and/or low public safety risk" prisoners, including "any person age 50 or older or within two years of a parole or release date."[6]

Mr. Sotelo's offense here involved only non-violent, addiction-motivated conduct, and, prior to being brought into federal custody, he received a diversionary sentence in state court.  PSR, ¶ 43.  As the recent actions by our state-court counterparts indicate, the COVID-19 pandemic has prioritized releasing non-violent offenders such as Mr. Sotelo who do not pose a risk to the community.  The Court should follow suit and exercise its discretion to impose a time-served sentence and release Mr. Sotelo immediately.

Indeed, keeping Mr. Sotelo jailed during the pandemic would be punishment "greater than necessary," as it would needlessly expose him to a very real threat to his health and even his life.  As one court in this district recently put it, "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided." *United States v Garlock*, No. 18-cr-00418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (sua sponte extending time to self-surrender).

---

[5] See "1,700 Inmates Released from Los Angeles County in Response to Coronavirus Outbreak."  Available at:  https://www.cbsnews.com/news/inmates-released-los-angeles-county-coronavirus-response-2020-03-24/

[6] Bertsch, Leann, et al., *A Public Health Doctor And Head Of Corrections Agree: We Must Immediately Release People From Jails And Prisons*, available at https://theappeal.org/a-public-health-doctor-and-head-of-corrections-agree-we-must-immediately-release-people-from-jails-and-prisons/#.Xn-5nzwbxzE.facebook

**Defendant's Sentencing Memo.**
*United States v. Sotelo*
CR 18-00165 WHO

    *i.*  *Incarceration in Either the BOP or Santa Rita Jail Will Expose Mr. Sotelo to a Greater Risk of COVID-19 Infection – A Punishment Much Greater Than Necessary Given his Offense*

  As of the date of this filing, the BOP has not announced that it will stop taking in new prisoners. However, COVID-19 has entered BOP facilities, with 28 confirmed cases among inmates and 24 among staff as of this writing[7], and one inmate has died.[8]  The BOP has been slow to implement procedures to prevent the spread of the virus.  Inmates continued to have social, legal and medical visits regularly until March 13, long after the initial spread of the virus in the community.[9]  And, until very recently, BOP continued to transfer inmates between facilities, and some of those inmates exhibited COVID-19 symptoms.[10]  That is all to say, the COVID-19 pandemic has likely taken root in the BOP prison system.

  Other correctional systems, like California's CDCR, faced with this reality have placed temporary moratoriums on accepting new prisoners.[11]  It seems likely that BOP will soon follow suit and stop accepting new inmates from pretrial detention facilities or at least from facilities such as Santa Rita jail where a COVID-19 infection has been confirmed.  Even under normal circumstances, in undersigned counsel's experience, it takes at least two months – and often times much longer – for a defendant to be designated and transferred to a BOP facility following sentencing.  Thus, even if BOP

---

[7] See https://www.bop.gov/coronavirus

[8] *Inmate dies of Covid-19 at federal prison in Oakdale*, available at: https://www.kplctv.com/2020/03/30/st-federal-inmate-dies-covid-fci-oakdale-i/

[9] *Federal Bureau of Prisons Covid-19 Modified Operations Plan*, at https://www.bop.gov/coronavirus/covid19_status.jsp.

[10] Letter from U.S. Representative Fred Keller to Michael Carvajal, Director, U.S. Bureau of Prisons (Mar. 24, 2020), describing how as recently as March 23, 2020 BOP conducted its weekly transfer of inmates to FCC Allenwood, two of whom exhibited COVID-19 symptoms.  Available at https://keller.house.gov/sites/keller.house.gov/files/03.24.20%20Letter%20to%20BOP%20Inmate%20Transfer.pdf.

[11] Executive Order N-36-20 (ordering CDCR to "suspend intake into state facilities for 30 days by directing that all persons convicted of felonies shall be received, detained, or housed in the jail or other facility currently detaining or housing them[.]"), available at https://www.gov.ca.gov/wp-content/uploads/2020/03/3.24.20-EO-N-36-20-text.pdf

continues to accept new prisoners from local facilities, Mr. Sotelo can expect to sit out the peak of the pandemic in California at Santa Rita jail, a facility wholly unequipped to prevent the spread of the disease or treat the sick.

Santa Rita had a well-documented history of cramped and unsanitary conditions and inadequate medical care before the threat of COVID-19 loomed. Inmates have suffered inadequate medical care for years. Two civil rights class action lawsuits are currently pending in the Northern District of California alleging a lack of adequate medical care, and a third class action alleges a lack of mental health treatment. *See Mohrbacher et al v. Alameda County Sheriff's Office et al*, 18-cv-00050 JD, (N.D. Cal.) (female inmate class action); *Gonzalez et al v. Ahern et al*, 19-cv-07423 JSC, (N.D. Cal.) (male inmate class action); *Babu et al v. Ahern et al*, 18-cv-07677 NC (N.D. Cal.). The complaints in these cases paint a disturbing picture, including inmates receiving no medical attention while undergoing drug detox (*Gonzalez*, Dkt. No. 1 at ¶ 94), inmates being denied lifesaving prescribed medication for weeks (*Id.* at ¶ 93), slow response times to medical emergencies like seizures (*Id.* at ¶ 96), and unanswered requests for medical attention by bed-ridden inmates (*Mohrbacher*, Dkt. No. 103 at ¶ 94). One horrifying example of the result of this inadequate care is inmate Candace Steel; in December 2019, Judge Donato denied Alameda Sherriff's motion to dismiss her complaint alleging Ms. Steel gave birth to her baby alone, on the ground, in an isolation cell after her screams for medical attention were ignored for hours. *Steel et al. v. Alameda County Sheriff's Office, et al.,* 18-cv-05072 JD (N.D. Cal.), Dkt. No. 14. The complaints in these cases likewise paint a bleak picture of the sanitation situation at Santa Rita. *See Gonzalez*, Dkt. No. 1 at ¶ 38 (noting communal bathrooms have no soap and inmates are provided minimal supplies to clean their living quarters); *id.* at ¶ 75 (describing kitchen without hand soap or nightly cleaning); *id.* at ¶ 39 (describing detoxing inmates vomiting and defecating in communal living areas because they are not placed in medical care); *Mohrbacher*, Dkt. No. 103 at ¶ 43 (women inmates provided inadequate menstrual pads and being forced to bleed through their clothes). More recently, on March 16, 2020, Santa Rita inmates filed a formal grievance with the Alameda County Board of Supervisors due to poor sanitation in Santa Rita and the inmates' related risk of contracting COVID.[12]

---

[12] https://sanfrancisco.cbslocal.com/2020/03/16/coronavirus-drives-dublin-inmates-to-file-grievance-over-jail-conditions/

**Defendant's Sentencing Memo.**
*United States v. Sotelo*
CR 18-00165 WHO

-11-

These examples are not isolated incidents, but rather, reflect a systemic problem at Santa Rita that led to the deaths of inmates even during normal times. As of October 2019, Santa Rita had a 50% higher death rate than the LA County jail system, the largest county jail system in the nation and one six times larger than Santa Rita.[13] That data led a state assembly member in February to call for an audit of the Alameda County Sheriff and Santa Rita to understand the Sheriff's spending of realignment funds and whether a lack of funding was creating dangerous conditions in Santa Rita.[14] In response, Alameda County Sheriff spokesperson Sgt. Ray Kelly implicitly recognized the inability of Santa Rita to adequately care for inmates, telling KTVU that an audit would likely show that the Sheriff needs more money to care for inmates, especially the mentally ill.[15]

In short, the jail is a breeding ground for disease and provides inadequate medical care even in normal times. But these are not normal times. Last week, as was inevitable, it was announced that a staff member in Housing Unit 31 of Santa Rita tested positive for COVID-19, resulting in lockdown of that housing unit and cessation of all transports to court by the U.S. Marshals Service. According to the Alameda County inmate locator,[16] Mr. Sotelo is housed in the unit next door, Housing Unit 32. As of the time of this filing, we have no report of anyone in Mr. Sotelo's housing unit having been infected. Given the lack of an adequate number of testing kits, that is no cause for comfort, of course. There is simply no way of knowing who has been infected, and who remains disease-free at Santa Rita. Certainly, given the rapid spread and infection rates of the COVID-19 virus in the outside population, spread at Santa Rita can be expected to be swift and deadly, given the unsanitary conditions, lack of ability to practice social isolation and chronic understaffing.

---

[13] Fernandez, Lisa, et al., "Death rate at Santa Rita exceeds nation's largest jail system as critics call for reform" (Oct. 1, 2019), https://www.ktvu.com/news/death-rate-at-santa-rita-exceeds-nations-largest-jail-system-as-critics-call-for-reform

[14] https://www.ktvu.com/news/alameda-co-sheriff-faces-state-audit-over-jail-conditions-spending

[15] *Id.*

[16] Available at https://www.acgov.org/sheriff_app/inmateSearch.do;jsessionid=kzJBr5zw8RO9yGXgFcIgyg__.ac01pap900:Inter-Crims02

**Defendant's Sentencing Memo.**
*United States v. Sotelo*
CR 18-00165 WHO

There is no question that Mr. Sotelo currently is at greatly increased risk for contracting the virus because of his status as an inmate at Santa Rita. On information and belief, undersigned counsel proffers that Housing Unit 32 is a dormitory style housing unit, where dozens of inmates live together in an open floor plan and without the ability to separate. Inmates sleep above and below one another in bunk beds. Showers and meals are all had communally, with inmates lining up in close proximity.

Thus, social distancing is not enforced during "pod time" when inmates mingle in the hall, line up closely for medicine distribution and meals, and watch TV together in close quarters. More fundamentally, social distancing is impossible in a place that requires many inmates to sleep closer than six feet apart from each other. In New York, the inability to social distance or take other measures that can slow the spread of the virus, has caused the rate of COVID-19 infection in the jails to dramatically out-pace the infection rate in New York City generally (by more than 7 times) and the country as a whole (by more than 72 times).[17]

While it is true that Mr. Sotelo does not fit the demographics of those particularly susceptible to dying from a COVID-19 infection – he is young and does not have an underlying medical condition – these facts provide little comfort to someone in Mr. Sotelo's position. It is a myth that COVID-19 poses serious risk only to the elderly and medically compromised. According to a Centers for Disease Control and Prevention analysis of the first 2,449 confirmed COVID-19 cases involving Americans of known age, those in Mr. Sotelo's age cohort (20-44 years) represented 29% of diagnoses, 20% of hospitalizations, and 12% of ICU admissions. The non-elderly, defined as 20-64 years, represented 20% of deaths.[18]

Given these realities, Courts across the country have begun to recognize that they must, when possible, look for alternatives to incarceration for offenders.[19] Serving seven months in Santa Rita is

---

[17] The Legal Aid Society, *COVID-19 Infection Tracking in NYC Jails*, available at: https://www.legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/

[18] *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19)—United States*, February 12-March 16, 2020, at https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2_w.

[19] *See Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (sua sponte releasing detainee from immigration detention "[I]n light of the rapidly escalating public health crisis");

**Defendant's Sentencing Memo.**
*United States v. Sotelo*
CR 18-00165 WHO

-13-

harsh punishment under any circumstances, but it is certainly sufficient punishment in this time of emergency for a youthful, first-time offender whose crime was driven by addiction.

## IV. CONCLUSION

For the foregoing reasons, the defense respectfully requests that this Court sentence Mr. Sotelo to time served followed by one year of supervised release.

Respectfully submitted,

DATED: March 30, 2020              /s/
                                   Mary McNamara
                                   Britt Evangelist
                                   SWANSON & McNAMARA LLP
                                   Attorney for AJAHNI SOTELO

---

*United States v. Selna*, 8:16-cr-76-JVS (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i)); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in sua sponte extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); *United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (sua sponte inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic"); *United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Washoe County Detention Facility"); *United States v. Copeland*, No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic").

**Defendant's Sentencing Memo.**
*United States v. Sotelo*
CR 18-00165 WHO